NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2026 IL App (4th) 250566-U

NO. 4-25-0566

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
August 13, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Peoria County |
| PERVIS T. FAULKNER, | ) | No. 24CF778 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Paul P. Gilfillan and |
| | ) | Mark E. Gilles, |
| | ) | Judges Presiding. |

JUSTICE LANNERD delivered the judgment of the court.
Justices Zenoff and Cavanagh concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The appellate court reversed defendant's conviction of aggravated domestic battery (720 ILCS 5/12-3.3(a-5) (West 2024)) and remanded for a new trial, finding the trial court erred in admitting defendant's prior conviction for harassment of a witness (720 ILCS 5/32-4a(a)(1) (West 2016)) as propensity evidence pursuant to section 115-7.4 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-7.4 (West 2024)).

¶ 2    In January 2025, defendant, Pervis T. Faulkner, was convicted of one count of

aggravated domestic battery (720 ILCS 5/12-3.3(a-5) (West 2024)) and sentenced to six years'

imprisonment. On appeal, he asserts (1) the evidence was insufficient to prove his guilt beyond a

reasonable doubt, (2) the trial court erred in admitting his prior conviction for harassment of a

witness (720 ILCS 5/32-4a(a)(1) (West 2016)) as propensity evidence pursuant to section 115-7.4

of the Code of Criminal Procedure of 1963 (Procedure Code) (725 ILCS 5/115-7.4 (West 2024)),

and (3) the court allowed "Inadmissible Hearsay to Be Heard by the Jury." Because we conclude

the court erred in admitting defendant's prior conviction for harassment of a witness as propensity evidence, we reverse and remand for a new trial.

¶ 3                                              I. BACKGROUND

¶ 4        On August 27, 2024, the State charged defendant with aggravated domestic battery (720 ILCS 5/12-3.3(a-5) (West 2024)). In September 2024, the grand jury indicted defendant for the same offense. The indictment alleged defendant, "in committing a battery to [K.M.], a family or household member of the defendant, knowingly strangled her by squeezing her throat." Defendant pleaded not guilty, and his jury trial was subsequently scheduled for November 2024.

¶ 5                    A. State's Motion to Admit Prior Acts of Domestic Violence

¶ 6        On November 13, 2024, the State filed a motion *in limine*, seeking to admit evidence of prior acts of domestic violence committed by defendant pursuant to section 115-7.4 of the Procedure Code. (725 ILCS 5/115-7.4 (West 2024)). In the motion, the State described the incident leading to the present charge against defendant as follows:

> "[K.M.], the girlfriend of the defendant stated that her [*sic*] and the defendant got into an argument and the victim left the situation. The defendant followed the victim and the confrontation turned physical with the defendant choking the victim. The victim had visible injuries to her neck and upper chest area. The defendant left the immediate area of where the victim was at."

The motion then described three "prior instances of domestic violence" involving three separate victims, each of whom was in a dating or sexual relationship with defendant. In one of the instances, police responded to a residence, where they found B.B. "completely nude and covered in blood." B.B. said defendant had become angry with her and hit her. She suffered "several injuries." including a "brain bleed." The motion indicated that, as a result of this incident,

- 2 -

"defendant was convicted of Home Invasion and Aggravated Domestic Battery in [case No.] 2016 CF 309." The other two incidents were described in a similar degree of detail. The motion did not mention a conviction for harassment of a witness or describe acts that could be construed as harassment of a witness. Further, the motion did not specify the type of evidence, such as testimony or certified copies of convictions, the State planned to introduce to establish these prior incidents of domestic violence.

¶ 7        On November 18, 2024, prior to jury selection, the trial court conducted a hearing on the State's motion *in limine*. Defense counsel objected to the motion on the basis he received inadequate notice. The court ruled five days' notice was sufficient. It then asked defense counsel, "Now, with regard to the substance of the *** incidents themselves *** in the motion," "[d]o you want to make any specific objections to the qualification of those three other domestic violence situations *** or shall we just move forward and acknowledge that they're coming in?" Defense counsel inquired whether the State "intend[ed] to just offer convictions or *** they intend[ed] to offer just incidents." The State asserted it would offer "a certified copy of conviction in each of the prior cases cited in our motion" for the purpose showing defendant's propensity to commit such acts. Defense counsel then stated he objected "to the future offering of these three convictions because generally you can use these for impeachment." The court stated defense counsel's "objection [was] overruled," and it would admit the "three certified copies," subject to the court's "comparing them to the statute."

¶ 8        After a discussion of the trial court's intended jury selection process, the court returned to the State's motion. The State indicated it would "just be admitting 16-CF-334 and 16-CF-309," which both involved the same victim, B.B. In case No. 16-CF-309, defendant was found guilty of home invasion (720 ILCS 5/19-6(a)(2) (West 2016)), aggravated domestic battery (720

- 3 -

ILCS 5/12-3.3(a) (West 2016)), aggravated battery (720 ILCS 5/12-3.05(a)(1) (West 2016)), and domestic battery (720 ILCS 5/12-3.2(a)(1) (West 2016)), which merged into a single conviction for home invasion and aggravated domestic battery, respectively. In case No. 16-CF-334, defendant was convicted of harassment of a witness (720 ILCS 5/32-4a(a)(1) (West 2016)). The indictment alleged defendant had communicated with B.B. about case No. 16-CF-309 "with the intent to harass or annoy [B.B.] because of her potential testimony *** in a manner so as to produce mental anguish or emotional distress to [B.B.]" The court then ruled it would allow the State to present the certified copies of defendant's convictions for aggravated domestic battery and domestic battery in case No. 16-CF-309 and harassment of a witness in case No. 16-CF-334. It instructed the State not to refer to those convictions in its opening statement. Additionally, the court cautioned the State against overemphasizing the convictions during its closing argument and stated, "I don't want those hammered upon time and time again." The State did not mention the convictions in its opening statement.

¶ 9                                   B. Jury Trial

¶ 10        After opening statements, the State called Brian Skaggs, a patrol officer with the Peoria Police Department.

¶ 11                          1. *Testimony of Brian Skaggs*

¶ 12        On August 26, 2024, at approximately 1 p.m., Patrol Officer Brian Skaggs and Patrol Officer Lance Skaggs were dispatched to an apartment complex. (For clarity, because both officers have the same last name, we will refer to them by their full names.) The dispatcher advised a caller had reported a man would not leave her apartment. They arrived at the address dispatch provided, but no one came to the door. "About the same time[,] a call came in about *** a man and a woman arguing, fighting in a parking lot" at the Metro Centre, which was "directly across

- 4 -

the street" from the apartment complex. Brian Skaggs and Lance Skaggs responded to the Metro Centre. Upon arrival, Brian Skaggs "made contact with [K.M.]," who "was irate." He observed "marks on her neck and upper chest," which appeared to be scratches. When he asked K.M. what had happened, she said her live-in boyfriend "choked her."

¶ 13 On cross-examination, Brian Skaggs said he spoke to K.M. for a "[f]ew minutes at least." He did not recall whether K.M.'s exact words were that her boyfriend "choked her." He "believe[d] she did say he choked her, but [he] didn't remember exactly how she framed it." He confirmed that "irate" was a correct description of K.M.'s demeanor. However, when asked if she seemed to have "an axe to grind," Brian Skaggs said she "was upset more than *** irate."

¶ 14 2. *Testimony of Philip Mahan*

¶ 15 Patrol Officer Philip Mahan of the Peoria Police Department responded to the call to the Metro Centre on August 26, 2024. Upon arrival, he encountered K.M, who was "[d]istraught. Upset. Crying." He observed scratch marks on her neck, and he photographed the injuries with his work-issued cell phone. He authenticated the photos, and they were admitted into evidence as State's exhibit Nos. 1 through 3. On cross-examination, he stated the only injuries he noticed K.M. having were scratches.

¶ 16 3. *Testimony of Lance Skaggs*

¶ 17 Patrol Officer Lance Skaggs testified he and Brian Skaggs responded to the call to the apartment complex and then, shortly after, the call to the Metro Centre. When Lance Skaggs and Brian Skaggs arrived at the Metro Centre, Mahan was already there. The other officers gave him a general description of the man involved in the altercation, and Lance Skaggs drove around the Metro Centre looking for him. When he entered a parking lot behind some restaurants, a man, whom Lance Skaggs later identified as defendant, approached Lance Skaggs's car and asked to

use a phone. Defendant told Lance Skaggs, "[H]e was the person [Lance Skaggs] was looking for." Lance Skaggs arrested and handcuffed defendant, then drove him back to the front of one of the restaurants, Jalapeños, to see if the other officers wanted to speak with him. Brian Skaggs spoke to defendant while Lance Skaggs completed paperwork in his vehicle, but Lance Skaggs was "not sure what all happened after that." When asked if he interacted with any individuals other than defendant at the Metro Centre, Lance Skaggs stated he overheard K.M. speaking and noted she seemed to be "mad about whatever happened between her and [defendant]," but he did not "have any conversation with her." He did notice K.M.'s neck was red and scratched. According to Lance Skaggs, defendant did not complain of any injuries when he was arrested, and Lance Skaggs did not observe any injuries on defendant.

¶ 18                                4. *Testimony of Leslie Amaro*

¶ 19          Leslie Amaro, a server at Jalapeños, was working the afternoon of August 26, 2024. While working, she noticed everyone near the restaurant window was looking outside. When she looked out, she saw a "girl in her car in an altercation with somebody else." The car was stopped in one of the lanes in the parking lot near the restaurant's front windows. "[T]he girl [was] getting *** attacked by the guy." When Amaro saw the woman, "she was like going at it," but, despite the car having tinted windows, "you could tell the person was getting attacked by the guy" and was being struck on the face, neck, and upper body. She thought the altercation lasted 15 or 20 minutes. She acknowledged the "entire incident" occurred inside the car, and therefore, she could not hear anything said between the individuals. At the end of the altercation, both individuals got out of the car, and the woman ran back into the car and locked the doors. Amaro then went outside because "nobody was helping [the woman] at all." The male, whom Amaro identified in court as defendant, told Amaro everything "was fine," but Amaro still went over to check on the woman.

According to Amaro, "[The woman] rolled down the window. Scratches everywhere. Bleeding on her neck." The woman was also crying. Amaro called 911 and told the woman to park her car. Defendant started to walk away. Amaro took the woman into the restaurant and tended to her scratches with a first aid kit.

¶ 20    On cross-examination, Amaro admitted the individuals were fighting with each other.

¶ 21    Following Amaro's testimony, the trial court recessed for the day.

¶ 22    The next morning, the State requested to recall Amaro. In support of this request, the State informed the trial court, "It's come to our attention that the victim has been asking the witness not to testify and we would like to make that part of the record." Defense counsel did not object. The court granted the State's request, saying, "If that's something new, that's probably legit." The State then elicited the following testimony from Amaro:

> "Q. Did [the victim] speak to you at all?
>
> A. Only when we were in [*sic*] the benches.
>
> Q. What did she say?
>
> A. She said she was on his side now.
>
> Q. I'm sorry?
>
> A. That she was on his side.
>
> Q. Did she ask you anything?
>
> A. No. She just said you don't have to say anything if you don't want to.

That's all she said."

When shown State's exhibit No. 1, a photograph of K.M., Amaro agreed that was the woman who spoke to her on the benches the previous day.

¶ 23                                    5. *Testimony of K.M.*

¶ 24        The State then called K.M. as a witness. K.M testified defendant was her boyfriend. On August 26, 2024, the two were arguing in their apartment. As the argument continued, they left the apartment so K.M. could drive defendant to his sister's home. However, K.M. pulled into the Metro Centre parking lot because the argument was distracting her. She "ended up slapping [defendant]." She "went to go slap him again. [Defendant] held [her] arm. Kind of blocked it. And that's what happened." K.M. then denied that defendant touched her anywhere, other than her arm. After this statement, the State asked K.M. if she recalled telling officers, "He got in my car. He won't leave me alone. He literally just strangled me right here because I wouldn't go anywhere. I'm like, bro." K.M. responded, "A little bit." The State asked, "Can you clarify that?" She responded, "I mean—yes."

¶ 25        On cross-examination, K.M. testified she and defendant had been arguing for approximately an hour before the police were called. According to K.M., the argument began at the apartment because she saw defendant had been calling "somebody" on his phone. Later, when they were arguing in her car in the Metro Centre parking lot, K.M. slapped defendant because "[h]e called [her] out of [her] name." When she tried to slap him again, he grabbed her right arm and pushed her arm back toward her neck. This caused the scratch marks on her neck. After defendant grabbed her arm, he got out of the car and walked away. Then, she went into Jalapeños and got a glass of water. When asked whether she met anyone in Jalapeños, K.M. said, "The lady," whom she agreed was "[t]he lady that was here earlier." The lady asked K.M. whether she was "okay" and gave her a glass of water. When defense counsel attempted to clarify whether K.M. encountered the lady inside Jalapeños, K.M. testified the lady "[m]et her outside and then [they] walked in to get a glass of water." Defense counsel asked how close the lady came to the car, and

K.M. said, "She ended up walking up to the car." K.M. admitted that when she talked to the police, she had used the word "choked," but she insisted she did not use the word "strangled." Further, she told the police defendant had choked her because she "was mad. Upset. *** Everything just happened so quick." She felt vindictive because she was angry at defendant. Defense counsel then asked K.M., "So, at no time [were] your air pipes constricted or reduced in a way in breathing?" She replied, "No." She further agreed the only scratches she received were "around the neck area."

¶ 26        On redirect examination, the State asked K.M. why, given she had testified during direct examination she recalled telling the officer, "[H]e literally just strangled me," she then testified during cross-examination she had never used the word "strangled." She responded, "I never said strangled. I did say he choked me, but I never said strangled." K.M. also insisted she hit defendant first but acknowledged she did not tell this fact to the officers. The State then asked K.M. why her description of what had happened had changed. She said it was "[b]ecause [her testimony was] the truth." When the State asked her why she did not tell the truth to the officers, she said, "I don't know."

¶ 27        6. *Admission of Certified Copies of Defendant's Convictions*

¶ 28        At the conclusion of K.M.'s testimony, the State rested, and the jury was excused. Once the jury left, the State advised the trial court it needed reopen its case in chief because of the "priors that [it was] trying to get in for the propensity." The State's proposed exhibits contained certified copies of defendant's convictions for harassment of a witness, aggravated domestic battery, and domestic battery. Defense counsel expressed confusion about how the conviction for harassment of a witness could be used for anything other than impeachment. The court responded, "Their motion classified harassment of a witness as domestic violence and cited the Order of Protection Act[,] I think." The court suggested this evidence was not for impeachment. The State

agreed, saying, "It would be propensity."

¶ 29　　　　Defense counsel disputed the admissibility of the convictions, arguing, "Now that we know what the acts were allegedly done, *** there's no pattern. There's no propensity. There's[ ] no similarity has been argued here at this stage for the purpose of for [*sic*] being brought in other than they're convictions." The trial court responded: "The 16-CF-309 [aggravated domestic battery and domestic battery convictions] are similar. They are within ten years of the incident so those will come in. The harassment of a witness [conviction in case No. 16-CF-334] falls under the definition of domestic violence so that will come in as well." The court restated its decision the jury would not see the certified copies of the convictions "because they contain a lot of different information."

¶ 30　　　　When the jury returned, the State asked the trial court to take judicial notice of a "certified copy of conviction of aggravated domestic battery [in case No. 16-CF-309] in which the defendant *** was convicted of that offense *** which occurred on April 24, 2016." It further requested the court take noticed of case "No. 16-CF-334," in which defendant "was convicted *** of harassment of a witness which occurred on April 25th of 2016." The court did so, while noting the prior objection by defendant to this evidence.

¶ 31　　　　　　　　　　　　　　7. *Testimony of Defendant*

¶ 32　　　　Defendant testified and was the sole witness for the defense. According to defendant, he and K.M. had been in a relationship for three or four years. He moved in with her about two months before the incident. On August 26, 2024, at approximately 8 a.m., he and K.M. started to argue about a text she had seen on his phone. The argument continued into the early afternoon. At approximately 1 p.m., the two left the apartment in K.M.'s vehicle. Defendant "was trying to get away from the situation" and was going to have K.M. drop him off at his sister's

- 10 -

home. The two were arguing while K.M. was driving, and K.M. pulled into the Metro Centre parking lot, which was across the street from their apartment.

¶ 33    The argument continued while K.M.'s car was parked near Jalapeños. The two "were going back and forth and that led to [defendant] calling [K.M.] a bitch." K.M. slapped defendant's face. When she tried to slap him again, he used his arm to push her arm back a few inches. During this blocking motion, he contacted her body in "her neck and shoulder area." He then got out of the car and walked away. He saw a police car pull up, and he approached it and asked whether the officer, whom he identified as Lance Skaggs, was looking for him. Lance Skaggs asked him if he had anything to do with K.M.'s injury. He said he did, and Lance Skaggs handcuffed him and took him to the front of the Metro Centre and then to jail. Defendant testified he did not make any statement after his arrest because no one had asked him for one.

¶ 34    On cross-examination, defendant acknowledged that State's exhibit Nos. 1 through 3 accurately depicted how K.M. appeared after the altercation. He agreed K.M. had scratches on her neck, face, and back, which were the result of his actions in self-defense. When the State asked defendant whether, when he and Lance Skaggs were both in the squad car, he had spoken to Lance Skaggs, defendant responded, "I said nothing happened, ever happened." The State then elicited the following testimony from defendant:

"Q. *** I'll ask you again. Do you recall Officer [Lance] Skaggs asking you, she's got scratches on her. What happened with that? And you, do you recall saying I swear to God we have rough sex every day? She likes choking and all that shit. I swear to God. Do you recall saying that?

A. Yes, I do.

Q. So, wait a second. You just said that you didn't talk to any officer or

- 11 -

anybody about what happened about this altercation. Now you're saying you did say this and that you did talk to the officer about what happened?

A. Correct. I just said I said something about—I said nothing ever happened. I never did not say—I never said I did not say anything.

Q. Okay. You're going to have to explain that. I didn't quite understand that.

A. You asked me did I ever say anything. I said nothing ever happened. I wasn't, I was unsure about the marks at the time so I said nothing happened because I walked away from the situation. And I also told him—yes. I did tell him, the officer, that we do have rough sex which she will testify on and on my behalf.

Q. That she likes choking?

A. Yes.

Q. Wait a second. You just told [defense counsel] here that you didn't talk to any officer about anything that occurred about how she received those injuries or about what happened and now you're saying that you, when asked about those scratches, they resulted from rough sex and she likes choking?

A. Correct.

Q. Well, which one was it? Did you not say anything? But now you're saying you did tell the officers that the injury occurred, her injuries occurred from rough sex?

A. I didn't say the injuries occurred from anything.

Q. Well—

A. I said she likes rough sex. He asked me where did the scratch marks came

- 12 -

[*sic*] from, where the scratch marks, where they may have came [*sic*] from. I said probably came from rough sex because that's what she likes.

Q. So, what you told [defense counsel] isn't accurate? You did talk to the officer about how she sustained those injuries?

A. For like two—he asked me a, brief questions like for two seconds. Yes.

Q. So, I just want to be clear. Even though you told [defense counsel] that you didn't tell the officer or didn't talk about how she sustained her injuries, you did, in fact, say they came from rough sex?

A. I said they may have come from rough sex.

Q. Okay. They may have?

A. Yeah. Correct."

The State then asked defendant whether he remembered if K.M. had any scratches when he woke up on the morning of the incident. Defendant responded K.M. was at work and did not come back until 11 a.m. or noon. He would not have noticed the scratches when she got home because they "instantly got into a heated argument and [he] was trying to get out of the situation." When the State asked if he saw marks on K.M. during the argument, defendant stated he had not seen marks on K.M.'s neck.

¶ 35　　Defense counsel declined to conduct any redirect examination. Following defendant's testimony, the defense rested, and the State said it would not put on any rebuttal evidence.

¶ 36　　　　　　　　　　8. *Closing Argument and Jury's Verdict*

¶ 37　　In its closing argument, the State highlighted the changing stories told by defendant and K.M. The State urged the jury to focus on the testimony from the responding officers and

- 13 -

K.M., defendant's statements on the day of the incident, and the photographs of K.M.'s injuries when deliberating.

> "So, you have heard all this evidence. You heard what happened, what [K.M. and defendant] said happened then and what they come in here now and say happened now or try to walk back what they said at the time. So, what I'm asking is that when you deliberate as going forward that you take [K.M.]'s word for it what happened at the time. What the officers testified to what they saw and what they investigated at the time.
>
> [K.M.] was strangled and she was strangled by the defendant. That's what the evidence shows."

The State did not mention defendant's convictions that were admitted as propensity evidence.

¶ 38　Defense counsel's closing argument began by highlighting the use of the word "choked" rather than "strangled" by both Brian Skaggs and K.M. when describing defendant's actions. Counsel then argued the evidence did not support the conclusion that K.M. had been strangled in the sense required by the jury instructions and suggested the police had failed to fully investigate the incident. He urged the jury to find defendant had acted in self-defense in response to K.M. hitting him.

¶ 39　The jury found defendant guilty of aggravated domestic battery.

¶ 40　　　　　　　　　　C. Posttrial Motion

¶ 41　Defense counsel filed a posttrial motion, seeking either a new trial or a judgment notwithstanding the verdict. Defendant argued, *inter alia*, (1) the State's propensity evidence had the purpose of smearing defendant before he presented his defense; (2) the "tampering with a witness charge was not a prior domestic offense"; and (3) "[t]he State was allowed to present the

- 14 -

certified convictions without producing witnesses that would substantiate the probative value of the proximity of time, the factual similarity or other relevant facts."

¶ 42 The trial court heard arguments on defendant's motion on January 10, 2025. (We note the trial judge retired shortly after defendant's trial. Consequently, another judge heard defendant's posttrial motion.) Defense counsel maintained there was no statute that allowed a conviction for harassment of a witness to be used as propensity evidence in a domestic violence case. The State believed the conviction was introduced as impeachment evidence rather than evidence of defendant's propensity to commit domestic violence. However, the State conceded it was not certain but argued, if the conviction was introduced as propensity evidence, any error was harmless because it had not referred to the conviction during its closing argument or at any other point. The court denied the motion.

¶ 43 Following the denial of defendant's motion, the parties proceeded immediately to sentencing, and the trial court sentenced defendant to six years' imprisonment. Thereafter, defendant filed a postsentencing motion, which the court denied.

¶ 44 This appeal followed.

¶ 45 II. ANALYSIS

¶ 46 On appeal, defendant raises three claims: (1) the State's evidence was insufficient to prove his guilt beyond a reasonable doubt because it failed to show (a) defendant's actions impeded K.M.'s breathing, (b) defendant intended to strangle K.M., and (c) defendant did not act in self-defense; (2) the trial court erred in admitting defendant's conviction for harassment of a witness as propensity evidence; and (3) Amaro's testimony about K.M.'s comments outside the courtroom was inadmissible hearsay.

¶ 47 A. Sufficiency of the Evidence

- 15 -

¶ 48                    1. *The Standard for the Sufficiency of the Evidence*

¶ 49         When a defendant challenges the sufficiency of the evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original and internal quotation marks omitted.) *People v. Collins*, 106 Ill. 2d 237, 261 (1985). Under this standard of review,

> "[t]he weight to be given the witnesses' testimony, the credibility of the witnesses, resolution of inconsistencies and conflicts in the evidence, and reasonable inferences to be drawn from the testimony are the responsibility of the trier of fact. [Citation.] Therefore, a reviewing court will not substitute its judgment for that of the trier of fact on issues involving the weight of the evidence or the credibility of witnesses." (Internal quotation marks omitted.) *People v. Johnson*, 2026 IL 131337, ¶ 59.

When we review a sufficiency-of-the-evidence claim, we allow all reasonable inferences from the evidence in favor of the State. *People v. Lloyd*, 2013 IL 113510, ¶ 42. Moreover, "[I]n weighing evidence, the trier of fact is not required to disregard inferences which flow normally from the evidence before it, nor need it search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt." (Internal quotation marks omitted.) *People v. Newton*, 2018 IL 122958, ¶ 24. A judgment will not be reversed "unless the evidence is so unreasonable, improbable, or unsatisfactory as to create a reasonable doubt of the defendant's guilt." *Id.*

¶ 50                    2. *Aggravated Domestic Battery–Strangulation*

¶ 51         "The State has the burden of proving beyond a reasonable doubt *each element* of an offense." (Emphasis added.) *People v. Gray*, 2017 IL 120958, ¶ 35. Here, that means, among

- 16 -

other things, the State was required to show defendant "strangle[d]" K.M. 720 ILCS 5/12-3.3(a-5) (West 2024).

¶ 52    Section 12-3.3(a-5) of the Criminal Code of 2012 (*id.*) defines "strangle" as follows: "For the purposes of [the aggravated domestic battery provision], 'strangle' means intentionally impeding the normal breathing or circulation of the blood of an individual by applying pressure on the throat or neck of that individual or by blocking the nose or mouth of that individual." Except when we are quoting testimony, we will use the word "strangle" in this sense.

¶ 53                                  3. *This Case*

¶ 54    Defendant argues the State failed to prove him guilty of aggravated domestic battery beyond a reasonable doubt because it failed to show (1) his actions impeded K.M.'s breathing, (2) he intended to impede K.M.'s circulation or breathing, and (3) he did not act in self-defense.

¶ 55              a. Whether Defendant Impeded K.M.'s Breathing

¶ 56    Defendant asserts there was no evidence presented to prove he impeded K.M.'s normal breathing. First, he suggests the evidence was weak because "[t]he only testimony implying that [he] had somehow 'choked' her was from the officers that responded to the scene." This is incorrect, as K.M. testified she told Brian Skaggs defendant choked her. We thus need not address this contention further. Second, he argues the jury should have credited K.M.'s testimony that his actions did not impede her normal breathing. Third, he contends that K.M.'s only visible injuries were scratches, and those injuries were inconsistent with the assertion defendant strangled her.

¶ 57    Based on a review of the record, we conclude the evidence was sufficient to find the State proved beyond a reasonable doubt defendant impeded K.M.'s normal breathing. During direct examination, K.M. acknowledged that she told the responding officers either that defendant

- 17 -

"literally just strangled" her or that he "choked" her. Although K.M. testified at trial that defendant did not impede her breathing, it was up to the jury to decide what parts of K.M.'s testimony it would accept; "[t]he jury may accept or reject all or part of a witness' testimony." (Internal quotation marks omitted.) *People v. Castejon*, 2025 IL App (1st) 221918, ¶ 18. Our supreme court has explained "recantations are generally regarded as unreliable, especially where [they] might have resulted from duress or perceived threat, and it is for the trier of fact to determine the credibility of recantation testimony." *Johnson*, 2026 IL 131337, ¶ 81. The jury could have reasonably concluded K.M.'s statement to the officers was truthful and made before she could think about the consequences of that statement, and her recantation during her trial testimony was motivated by either fear of, or loyalty to, defendant. This conclusion is even more reasonable based on Amaro's testimony about her encounter with K.M., in which K.M. said she was on defendant's side now.

¶ 58        We note it is immaterial whether K.M. used the term "choke" or "strangle" when she described defendant's attack to Brian Skaggs. The relevant common meaning of "strangle" is "to obstruct seriously or fatally the normal breathing of [a person]." https://www.merriam-webster.com/dictionary/strangle (last visited July 24, 2026). The relevant common meaning of "choke" is "to check or block normal breathing of by compressing or obstructing the trachea." https://www.merriam-webster.com/dictionary/choke (last visited July 24, 2026). The two words are close synonyms, although "strangle" may suggest a more serious obstruction of breathing. Regardless of which word K.M. used, the jury could reasonably conclude she was describing an act by which defendant impeded her breathing.

¶ 59        This conclusion is bolstered by the conversation defendant had with Lance Skaggs after Lance Skaggs had arrested defendant and both were in the squad car. When Lance Skaggs

asked defendant about K.M.'s scratches, defendant suggested they were the result of rough sex but then spontaneously brought up K.M.'s supposed preference for choking during sex. This suggests defendant, who had left the scene of the altercation before the police arrived, was concerned K.M. had injuries suggesting choking and was preparing an exculpatory explanation for those injuries.

¶ 60   Defendant contends, if he had choked K.M., she would have had bruises, not merely scratches. His argument is unpersuasive. Defendant has not explained why a reasonable jury would necessarily conclude any act impeding normal breathing would leave bruises visible at the time Officer Mahan took the evidence photographs. We reject the implication it is common knowledge (or even true) the minimum force required to impede normal breathing will necessarily cause bruising to every victim. Moreover, there was no such evidence presented. Additionally, we believe general experience teaches, if bruising will appear, it will not always do so immediately. Officer Mahan testified he photographed K.M.'s injuries when he arrived in response to the dispatch to the Metro Centre. A reasonable jury could conclude any bruises would not necessarily be visible at that time.

¶ 61   b. Defendant's Intent

¶ 62   Defendant argues the evidence is insufficient to show he acted intentionally when he choked K.M., which is required to establish that he "strangle[d]" her within the meaning of the aggravated domestic battery statute. 720 ILCS 5/12-3.3(a-5) (West 2024). He asserts

> "[he] did not have the intent to strangle [K.M.]; this is obvious because he simply pushed her arm back and did not grab her throat or in any other way intentionally impede her airway. [His] only intent in his actions was to protect himself from being repeatedly struck by [K.M.]"

¶ 63   This argument is unpersuasive because it effectively asks us to consider the

- 19 -

evidence in the light most favorable to *defendant*. We have discussed how the jury could reasonably conclude defendant impeded K.M.'s normal breathing. Having so concluded, the jury could have considered the setting of the altercation to reasonably conclude defendant *intentionally* impeded her normal breathing. While there may be circumstances in which a person could unintentionally choke another, based on the evidence presented in this case, the jury could have reasonably concluded an altercation between two people seated in the front of a vehicle is not such a circumstance. Consequently, we find there was sufficient evidence presented for the jury to conclude defendant intentionally strangled K.M.

¶ 64        Defendant suggests *People v. White*, 2021 IL App (2d) 200577-U, supports his contention that the evidence in this case was insufficient to prove beyond a reasonable doubt he intentionally strangled K.M. However, *White* does not aid defendant. The victim in *White*

> "testified that [the] defendant knocked her to the ground and placed his hand '[a]cross the front of [her] throat.' When he did so, [the victim] could not breathe and felt as though she would die. [The victim's] testimony [thus] established that [the] defendant intentionally impeded her normal breathing by applying pressure to her throat." *Id.* ¶ 20.

Nothing in the *White* court's analysis suggests it deemed the question of the evidence's sufficiency to be a close one. Therefore, the decision does not usefully illustrate the lower threshold of sufficient evidence to prove intent.

¶ 65                                    c. Self-Defense

¶ 66        Defendant contends the State failed to offer sufficient evidence to rebut his self-defense claim. We disagree. Once a defendant has properly raised a defense of self-defense, "the State has the burden of proving beyond a reasonable doubt that the defendant did not act in self-

defense, in addition to proving the elements of the charged offense." *Gray*, 2017 IL 120958, ¶ 50. Defendant asserts the State's evidence was insufficient because the evidence showed K.M. tried to strike him and he merely prevented her from doing so. Here again, rather than making an argument which recognizes we must "allow all reasonable inferences from the [evidence] in favor of the prosecution" (*Lloyd*, 2013 IL 113510, ¶ 42), defendant asks us to assume the jury had to believe his and K.M.'s testimony. For the reasons set out above, we hold a reasonable jury could reject this testimony.

¶ 67 Based on the foregoing, we conclude the evidence was sufficient to sustain defendant's conviction of aggravated domestic battery.

¶ 68 B. Admission of Other-Crimes Evidence

¶ 69 Defendant contends the trial court made multiple errors in admitting his conviction of harassment of a witness as section 115-7.4 propensity evidence. He argues, *inter alia*, the prejudicial effect of this evidence greatly outweighed its probative value. He contends the court, in conducting an "abbreviated" hearing, did not consider the admissibility factors set out in section 115-7.4(b) (725 ILCS 5/115-7.4(b) (West 2024)), notably, "the degree of factual similarity to the charged or predicate offense" (*id.* § 115-7.4(b)(2)). Further, he maintains, because the State presented only his conviction for harassment of a witness, there was no evidence of prior domestic violence. Finally, he contends the admission of the harassment of a witness conviction was prejudicial because it allowed the jury to infer defendant had the propensity to harass witnesses, and because the evidence was closely balanced, this was not harmless error.

¶ 70 In response, the State argues, "[T]he trial court indicated it would be conducting a balancing test and, in an attempt to reduce prejudicial effect, ruled the State could not raise the convictions during opening statements. The trial court also asked that the convictions be brought

- 21 -

up minimally during closing arguments." Further, quoting our decision in *People v. Kelley*, 2019 IL App (4th) 160598, ¶ 105, the State argues section 115-7.4 was intended to allow the State to admit evidence of a defendant's propensity to commit acts of domestic violence, and " 'the objective under section 115-7.4(b)(2) is not to identify factual differences just for the sake of identifying factual differences. The differences have to logically matter; they have to be relevant, in a commonsensical way, to the probative value of the previous offense as propensity evidence.' " The State argues the evidence here met *Kelley*'s standard because the harassment occurred eight years previously, the victims were either family or household members, and the offense was one of domestic violence. Moreover, it contends, "The domestic violence offense of harassment of a witness does not serve to unduly prejudice defendant by proving a general propensity to do bad things, but holds the requisite probative value to prove, to some extent, defendant's propensity to commit domestic violence."

¶ 71                                    1. *Applicable Law*

¶ 72            Section 115-7.4 provides, in relevant part, the following:

"(a) In a criminal prosecution in which the defendant is accused of an offense of domestic violence as defined [in another provision], *** evidence of the defendant's commission of another offense or offenses of domestic violence is admissible, and may be considered for its bearing on any matter to which it is relevant.

(b) In weighing the probative value of the evidence against undue prejudice to the defendant, the court may consider:

(1) the proximity in time to the charged or predicate offense;

(2) the degree of factual similarity to the charged or predicate

offense; or

(3) other relevant facts and circumstances.

(c) In a criminal case in which the prosecution intends to offer evidence under this Section, it must disclose the evidence *** at a reasonable time in advance of trial, or during trial if the court excuses pretrial notice on good cause shown." 725 ILCS 5/115-7.4 (West 2024).

¶ 73 "[E]vidence of a defendant's commission of other acts of domestic violence" is admissible in the circumstances set out in section 115-7.4 "*so long as* the evidence is relevant and *its probative value is not substantially outweighed by the risk of undue prejudice*." (Emphases added.) *People v. Dabbs*, 239 Ill. 2d 277, 291 (2010). In *Dabbs*, our supreme court noted section 115-7.4 "abrogate[s], in part, a long-standing common law rule of evidence," the rule against the admission of evidence of other crimes by a defendant to show the defendant's criminal propensity. *Id.* at 283, 288. Because section 115-.7.4 abrogates the common law rule against admitting evidence of prior bad acts to show propensity for crime, courts must construe the section narrowly, "in a manner that preserves for [the] defendant, as much as is possible consistent with the legislative purpose, all of the protections that otherwise exist in our rules of evidence." *Id.*

¶ 74 When deciding whether evidence is admissible under section 115-7.4, a trial court should find undue prejudice from the admission of prior convictions if they tend to show merely criminal propensity generally, rather than propensity toward the act with which a defendant is charged. In *Kelley*, on which the State relies, we addressed the meaning of undue prejudice under section 115-7.4, holding, " 'Undue prejudice' *** necessarily is prejudice other than that resulting from proof of the defendant's propensity to commit domestic violence, because the very purpose of section 115-7.4 is to lift the common-law ban on that particular kind of propensity evidence."

- 23 -

*Kelley*, 2019 IL App (4th) 160598, ¶ 77.

> "The qualifier 'undue' is crucial because prosecuting the defendant necessarily entails adducing evidence prejudicial to the defendant. [Citation.] *** The prejudice [from propensity evidence], however, is undue if the *** evidence is calculated to persuade the jury to return a guilty verdict only because the defendant supposedly is a bad person who, in any event, deserves to be punished. [Citation.] If that were the use to which the so-called 'propensity evidence' were put, it really would not even be propensity evidence; the strategy would be to obtain a guilty verdict not on the reasoning that the defendant's badness predisposed him to commit the charged offense but, rather, on the quite different reasoning that because the defendant is bad, he deserves whatever punishment can be heaped upon him ***." (Emphasis omitted.) *Id.* ¶ 102.

We therefore concluded, to be admissible under section 115-7.3 (725 ILCS 5/115-7.3 (West 2014)) (concerning other-crimes evidence in sexual offense cases)—and thus section 115-7.4, which is analogous (*Kelley*, 2019 IL App (4th) 160598, ¶ 105)—"the evidence has to be, genuinely, propensity evidence—and not only that, but a particular kind of propensity evidence." *Id.* ¶ 103. "If all the propensity evidence does is prove the defendant's propensity to do bad things in general, it remains inadmissible [citation]; the propensity evidence must more narrowly tend to prove the defendant's propensity to commit [the same type of] offenses." *Id.*

¶ 75    "The admissibility of other-crimes evidence," including evidence admitted under section 115-7.4, "is within the sound discretion of the trial court, and its decision on the matter will not be disturbed absent a clear abuse of that discretion." *Dabbs*, 239 Ill. 2d at 284. "An abuse of discretion occurs when the trial court's decision is arbitrary, fanciful, or unreasonable or when

no reasonable person would agree with the trial court's position." *People v. Brand*, 2021 IL 125945, ¶ 36.

¶ 76                                              2. *This Case*

¶ 77        We hold the admission of defendant's conviction for harassment of a witness was an abuse of discretion and not harmless. The fundamental flaw in this evidence was, regardless of whether the conviction was based on an act of domestic violence, the admission of the certified copy of this conviction did not tend to prove defendant's propensity to commit acts of domestic violence. Instead, it merely tended to show defendant's general propensity to commit bad acts.

¶ 78        Initially, we are not persuaded that the evidence the jury heard can properly be categorized as evidence defendant committed another offense of domestic violence. "Evidence," in the relevant sense is, "[s]omething (including testimony, documents, and tangible objects) that tends to prove or disprove the existence of an alleged fact." Evidence, Black's Law Dictionary (12th ed. 2024). Section 115-7.4(a) (725 ILCS 5/115-7.4(a) (West 2024)) provides for the admissibility of "evidence of the defendant's commission of another offense or offenses of domestic violence." Because the name of the offense ("harassment of a witness") does not imply domestic violence, the trial court's admission of defendant's conviction for that offense did not tend to prove he had been convicted of another offense of domestic violence; the jury did not hear anything from which it could infer defendant had committed another offense of domestic violence.

¶ 79        Further, because witness harassment has no evident connection to domestic violence, bare evidence of a conviction for harassment of a witness is, under *Kelley*, merely evidence of "defendant's propensity to do bad things in general" (*Kelley*, 2019 IL App (4th) 160598, ¶ 103). It has no bearing on defendant's propensity to commit domestic violence specifically and is thus not proper propensity evidence at all. See *id.* ¶ 103. As the conviction was

not at all probative of defendant's propensity to commit acts of domestic violence, the risk of undue prejudice from admitting the conviction substantially outweighed its probative value (see *Dabbs*, 239 Ill. 2d at 291). The trial court abused its discretion by admitting this evidence because the probative value of the conviction was not substantially outweighed by the risk of undue prejudice.

¶ 80 The State argues the harassment of a witness conviction was admissible because the act upon which the conviction was based was an act of "domestic violence" under the relevant statutory definitions. According to the indictment, defendant had communicated with B.B. about case No. 16-CF-309 (the aggravated domestic battery charge against defendant) "with the intent to harass or annoy [B.B.] because of her potential testimony *** in a manner so as to produce mental anguish or emotional distress to [B.B.]" According to the State, the differences between that act and the act at issue here were not ones which, " 'in a commonsensical way,' " were relevant " 'to the probative value of the previous offense as propensity evidence' " (quoting *Kelley,* 2019 IL App (4th) 160598, ¶ 105). This would mean the specific acts supporting defendant's conviction for harassment of a witness would constitute domestic violence, although the same is not indicated in the title of the offence. However, the nature of the acts supporting the harassment of a witness conviction is not determinative here because the fact finder, the jury, heard only that defendant was convicted of harassment of a witness and had no way to know whether that conviction was probative of defendant's propensity to commit domestic violence. Instead, without further evidence, the evidence tended to prove only defendant's overall bad character and propensity to commit bad acts.

¶ 81 The State further contends the trial court gave reasonable consideration to the risk of undue prejudice by, for instance, telling the prosecutor not to overemphasize the conviction in

its closing argument. We disagree. If evidence offered to show a particular propensity is not probative of the relevant propensity, it is purely prejudicial. The court's attempt to reduce the harm caused by the admission of improper evidence is pertinent to a harmless error analysis but is not relevant to the admissibility of the evidence.

¶ 82                                3. *Harmless Error*

¶ 83        The State argues any error by the trial court in admitting defendant's conviction for harassment of a witness was harmless because the jury only heard about the conviction once. We disagree. When a defendant demonstrates the presence of a purely evidentiary error, to show that error was harmless, the State must show "there is no reasonable probability the jury would have acquitted the defendant absent the error." *People v. Rainey*, 2025 IL App (1st) 230639, ¶ 43.

¶ 84        The State cannot make that showing. First, as defendant suggests, the evidence he was guilty of harassing a witness could have caused the jury to suspect a nefarious reason for K.M.'s recantation. This is especially relevant because witness credibility played a substantial role in this case. Second, although the jury heard about the conviction only once, it was introduced in a way which tended to draw it to the jury's attention: the State rested and the jury left the courtroom, but, when it returned, the trial court allowed the State to reopen its case solely to introduce the convictions. Third, the evidence in this case was closely balanced. While defendant's initial explanation, attributing K.M.'s injuries to rough sex, appeared unrealistic, his description of the events in the car at least appeared plausible. Indeed, a small change in the evidence might have shifted the jury's credibility determination, and thus, the balance of the evidence may have tipped in defendant's favor. Thus, under the specific facts of this case, we cannot conclude the error here was harmless.

¶ 85        Although we hold the trial court erred in admitting the evidence of defendant's

conviction for harassment of a witness and this error was not harmless, he is nevertheless subject to retrial. "The double jeopardy clause does not preclude retrial when a conviction has been overturned because of an error in the trial proceedings, but retrial is barred if the evidence introduced at the initial trial was insufficient to sustain the conviction." *People v. Drake*, 2019 IL 123734, ¶ 20. As discussed *supra* ¶¶ 57-67, we find the evidence presented was sufficient to prove defendant guilty of aggravated domestic battery beyond a reasonable doubt. Accordingly, we must remand the matter for a new trial.

¶ 86        We would be remiss if we did not note the problems in the trial court's application of section 115-7.4 extend beyond what we have addressed in finding reversible error. For instance, section 115-7.4(c) (725 ILCS 5/115-7.4(c) (West 2024)) provides, "In a criminal case in which the prosecution intends to offer evidence under this Section, it must disclose *the evidence* *** at a reasonable time in advance of trial, or during trial if the court excuses pretrial notice on good cause shown." (Emphasis added.) Here, the State's motion *in limine* did not disclose its intent to offer defendant's conviction for harassment of a witness as propensity evidence. Further, the State did not ask the court to excuse its late disclosure; indeed, it did not seem to recognize its evidence did not match what it disclosed in the motion. This lack of disclosure appears to have stunned defense counsel, who more than once expressed surprise the State intended to admit the conviction for any purpose but impeachment.

¶ 87            C. Amaro's Testimony About Her Conversation with K.M.

¶ 88        Defendant argues the trial court erred in allowing Amaro's testimony about K.M. describing herself as being on defendant's side and suggesting Amaro need not testify because it was inadmissible hearsay. He concedes, because defense counsel failed to make a contemporaneous objection to the testimony and failed to raise the issue in a posttrial motion, he

forfeited appellate review of the issue. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (Absent a trial objection and a failure to raise the issue in a posttrial motion, the issue is forfeited for review on appeal.). However, he argues the admission of the evidence resulted in reversible error under two theories: (1) the admission of this evidence was first-prong plain error and (2) counsel was ineffective for failing to object to the testimony's admission. The State responds, *inter alia*, the statement was admissible under Illinois Rule of Evidence 803(3) (eff. Jan. 25, 2023), as evidence of K.M.'s state of mind in her upcoming testimony.

¶ 89　　　　Although we have determined this case should be remanded for a new trial, we address defendant's argument about the admissibility of Amaro's statements because the admissibility of this evidence is likely to be an issue on retrial.

¶ 90　　　　　　　　　　　　　　　　1. *Plain Error*

¶ 91　　　　Any issue a defendant failed to preserve may receive appellate review despite the forfeiture if it constitutes "[p]lain error[ ]." Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967). Rule 615(a) provides: "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." *Id.* It is a matter for the reviewing court's discretion whether to overlook a procedural forfeiture; our supreme court has "identified two instances when it is appropriate to do so." *People v. Chambliss*, 2026 IL 130585, ¶ 61. We are concerned with the first of these instances: "when a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error"—first-prong plain error. (Internal quotation marks omitted.) *Id.* "The initial analytical step under *** the plain error doctrine is determining whether there was a clear or obvious error before the trial court." *Id.* ¶ 62. "Without reversible error, there can be no plain error." *People v. Jackson*, 2020 IL 124112, ¶ 88. The defendant bears the burden of

persuasion in establishing plain error. *Chambliss*, 2026 IL 130585, ¶ 61.

¶ 92        When an evidentiary issue is preserved, we review a trial court's decisions on the admissibility of evidence under the abuse-of-discretion standard. *Brand*, 2021 IL 125945, ¶ 36. However, some authorities treat some decisions concerning the application of hearsay rules as questions of law: "A trial court has discretion to decide whether to admit or exclude a statement under hearsay rules, but the question of whether a statement is inadmissible hearsay is one of law when the determination does not involve fact finding or weighing the credibility of the witnesses." (Internal quotation marks omitted.) *People v. Wills*, 2017 IL App (2d) 150240, ¶ 55. We review pure issues of law *de novo*—without deference to the court. See, *e.g.*, *People v. Whitaker*, 2024 IL App (1st) 232009, ¶ 46. When, in evaluating defendant's claim of plain error and first considering whether clear or obvious error occurred, we will give defendant the benefit of addressing *de novo* compliance with the rules relating to hearsay.

¶ 93                              2. *The Hearsay Rules*

¶ 94        Hearsay is inadmissible except as provided for under rules adopted by our supreme court or by appropriate statutes. Ill. R. Evid. 802 (eff. Jan. 1, 2011). With exceptions not relevant here, Illinois Rule of Evidence 801(c) (eff. Oct. 15, 2015) defines "hearsay," as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Illinois Rule of Evidence 801(a) (eff. Oct. 15, 2015) defines a "statement" as "(1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion."

¶ 95                              3. *This Case*

¶ 96        Defendant argues the statements by K.M. that she was on "his side now" and Amaro [didn't] have to say anything if [she didn't] want to" were inadmissible hearsay, and their

admission was first-prong plain error. He contends they were admitted for the truth of the matter asserted and did not fall under any hearsay exceptions. Further, defendant asserts, because the evidence was closely balanced, the admission of the testimony was first-prong plain error.

¶ 97 The State responds, contending both parts of Amaro's declarations were admissible. It first argues, "Whether it was true or not that Amaro had to say anything when appearing as a witness at defendant's trial was irrelevant to the issues at trial," and thus would not be admitted for its truth. Next, "whether [K.M.] was now on defendant's side was not admitted for the truth of the matter asserted. The fact that a victim is on the side of the defendant in a domestic battery case, if true, could be quite damaging to the State's case." Alternatively, it argues the declaration was admissible under the state-of-mind exception to the hearsay rule. See Ill. R. Evid. 803(3) (eff. Jan. 25, 2023).

¶ 98 In response to the State's argument, defendant, citing *People v. Weaver*, 92 Ill. 2d 545 (1982), and *People v. McMurtry*, 279 Ill. App. 3d 865 (1996), contends K.M.'s declaration is not the sort of statement envisioned admissible under Rule 803(3). He asserts, "The State's argument that [K.M.'s declaration] was admissible under Rule 803(3) is an attempt to circumvent the requirements for doing so that were not met here, *i.e.*[,] that [K.M.'s] testimony was more damaging than if she had not testified at all." Although defendant does not explain to what "doing so" refers, his citations relate to when a party may impeach their own witness. *Weaver*, 92 Ill. 2d at 563-64; *McMurtry*, 279 Ill. App. 3d at 872. Based on these citations, it appears defendant is asserting the introduction of the statements amounted to the State's attempt to impeach K.M., a witness for the State.

¶ 99 We conclude defendant has forfeited this claim. First, nothing prevented defendant from raising such a claim in his brief. A brief must contain defendant's argument, and any "[p]oints

not argued [in the brief] are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing." Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). Defendant's suggestion the testimony at issue was akin to improper impeachment first appeared in his reply brief and is thus forfeited. He has also forfeited any such argument because he has failed to make it clearly. See, *e.g.*, *People v. Hui*, 2022 IL App (2d) 190846, ¶ 52 ("T[he reviewing] court is entitled to have issues clearly defined with pertinent authority cited and coherent arguments presented; any arguments inadequately presented are forfeited."). Here, we had to make assumptions about defendant's argument based on the sources he cited.

¶ 100　　　　　Second, with respect to the admissibility of K.M.'s statements to Amaro, we conclude neither part of Amaro's testimony describing her courtroom encounter with K.M. was inadmissible hearsay. Indeed, it is neither clear nor obvious the testimony was hearsay at all. The natural inference to draw from Amaro's testimony concerning the encounter was K.M. was trying to discourage Amaro from testifying. If one understands K.M.'s words to Amaro this way, their significance was not their truth, but what K.M. was trying to accomplish: presumably, to weaken the case against defendant. This action suggests bias. K.M.'s statement she was "on his side now" was almost certainly true in some sense; there seems to be little reason other than some type of support for defendant for her to approach Amaro in the way Amaro described. Nevertheless, the relevance of K.M.'s statements was not their truth but their tendency to show she was trying, for whatever reason, to aid defendant's case. Thus, as it was not clear or obvious the statements were hearsay, the trial court's admission of them was not plain error. See *Chambliss*, 2026 IL 130585, ¶ 62 (holding the first step in deciding whether plain error occurred is determining whether there was any clear or obvious error).

¶ 101　　　　　　　　　　4. *Ineffective Assistance of Counsel*

¶ 102 Because we concluded the trial court's admission of K.M.'s statements to Amaro was not a clear or obvious error, we need not address defendant's ineffective-assistance-of-counsel claim on this matter. Without a clear or obvious error, there can be no plain error and no ineffective assistance of counsel for failing to raise the claim. See *People v. Jones*, 2020 IL App (4th) 190909, ¶ 179 ("Absent a clear or obvious error \*\*\*, neither the doctrine of plain error nor a theory of ineffective assistance affords any relief from the forfeiture.").

¶ 103       III. CONCLUSION

¶ 104 For the reasons stated, we reverse defendant's conviction and sentence and remand the cause for a new trial.

¶ 105 Reversed and remanded.